**CHIC OPTIC, INC., and Contour Optik, Inc., Plaintiffs,**

**v.**

**E'LITE OPTIK, INC., Defendant.**

**Civil Action No. 3:00–CV–2010–L.**

United States District Court,
N.D. Texas,
Dallas Division.

Nov. 27, 2007.

Daniel V. Thompson, Thompson & Gustavson, Dallas, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

SAM A. LINDSAY, District Judge.

Before the court are: the Findings, Conclusions, and Recommendations of the United States Magistrate Judge, filed August 30, 2006; Objections to the Magistrate Judge's Proposed Findings and Claim Construction by Defendant E'Lite Optik, Inc., filed September 12, 2006; Plaintiffs' Response to Defendant E'Lite's Objection to the Magistrate Judge's Findings, Conclusion, and Recommendations on Claim Construction, filed September 25, 2006; and Reply Brief in Support of Objections to the Magistrate Judge's Proposed Findings and Claim Construction by Defendant E'Lite Optik, Inc., filed October 6, 2006.

Having carefully considered the Findings, Conclusions, and Recommendations of the United States Magistrate Judge, Defendant E'Lite Optik, Inc.'s objections, Plaintiffs' Response to Defendant's objections, Defendant's reply to Plaintiffs' response, record, and applicable law, for the reasons set forth below, the court determines that the magistrate judge's findings and conclusions are correct. Accordingly, the court **accepts** them as those of the court.

## I. Factual and Procedural Background

This is a patent infringement lawsuit. On August 29, 2000, the United States Patent and Trademark Office ("PTO") issued United States Patent No. 6,109,747 ("the '747 Patent"), which names David Chao as the inventor and Plaintiff Contour Optik, Inc. ("Contour") as the assignee of an invention relating to an eyeglass frame with an auxiliary frame and lenses. Plaintiff Chic Optic, Inc. ("Chic Optic") is an exclusive licensee of the invention. Chic Optik in turn granted a sublicense to Aspex Eyewear ("Aspex"). On September

13, 2000, Contour, Chic Optic, and Aspex[1] filed this lawsuit against Defendant E'Lite Optik, Inc. ("Defendant"), alleging infringement on the '747 Patent. E'Lite has counterclaimed seeking, among other things, a declaration that it is not infringing the '747 Patent and that the '747 Patent is invalid and unenforceable.

The parties filed a joint claim construction statement on November 23, 2005, followed by extensive briefing, seeking construction of six terms in the '747 Patent. Pursuant to a standing order of reference, on June 30, 2006, this case was referred to United States Magistrate Judge Irma C. Ramirez for a claim construction hearing. The magistrate judge held a claim construction hearing on July 21, 2006. On August 30, 2006, the magistrate judge filed her Findings, Conclusions and Recommendations (hereinafter "Report and Recommendation"). On September 12, 2006, Defendant filed Objections to the Magistrate Judge's Proposed Findings and Claim Construction. On September 25, 2006, Plaintiffs filed their Response to Defendant E'Lite's Objection to the Magistrate Judge's Findings, Conclusions, and Recommendations on Claim Construction. On October 6, 2006, Defendant filed its Reply Brief in Support of Objections to the Magistrate Judge's Proposed Findings and Claim Construction.

## II. Legal Standard

Patent infringement is the unauthorized making, using, selling, offering to sell, or importing into the United States of any patented invention during the term of the patent. 35 U.S.C. § 271(a). Patent infringement analysis involves two steps. In the first step the court determines the proper construction of the patent claims by establishing, as a matter of law, the scope and boundaries of the subject matter that is patented. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 384–85, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In the second step the trier of fact compares the properly construed claims to the allegedly infringing device(s) and determines whether there has been an infringement. *Id.* The issue before the court at this time is construction of various claims of the '878 patent.

" 'Claim construction' is the judicial statement of what is and is not covered by the technical terms and other words of the claims." *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed.Cir.2001). *See also United States Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed.Cir.), *cert. denied,* 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997). The claims of a patent are the numbered paragraphs at the end of the patent that define the scope of the invention and thus the scope of the patentee's right to exclude others from making, using, or selling the patented invention. *See Astrazeneca AB v. Mutual Pharmaceutical Co.,* 384 F.3d 1333, 1336 (Fed.Cir.2004).

"[T]he words of a claim 'are generally given their ordinary and customary meaning.' " *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005), *cert. denied,* 546 U.S. 1170, 126 S.Ct. 1332, 164 L.Ed.2d 49 (2006) (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)). Ordinary and customary meaning is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Id.* at 1313. "In some cases,

---

1. Pursuant to an order dated August 26, 2003, the court dismissed Plaintiff Aspex Eyewear for lack of standing.

the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. When the ordinary and customary meaning of a term is not readily apparent, "the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed.Cir.2004)). "Those sources include the words of the claims themselves, the [patent] specification, the prosecution history, and extrinsic evidence." *Id.*

■ "The claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). Section 112 of the Patent Act, 35 U.S.C. § 112, states that the specification:

> shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. "The specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). "[T]he specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'" *Id.* at 1321 (quoting *Vitronics*, 90 F.3d at 1582).

■ In addition to the specification, the court should also consider the prosecution history, if it is in evidence, in determining the meaning of disputed claim terms. *Phillips*, 415 F.3d at 1317. The prosecution history is part of the intrinsic record and consists of a complete record of all proceedings before the Patent and Trademark Office ("PTO"), including the prior art cited during the examination of the patent. *Phillips*, 415 F.3d at 1317. The prosecution history also includes any express representations made by the applicant regarding the scope of the claims. *Vitronics*, 90 F.3d at 1582. "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. The prosecution history can, however, "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* (citing *Vitronics*, 90 F.3d at 1582–83).

Despite the Federal Circuit's emphasis on the importance of intrinsic evidence in claim construction, it has "also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Id.* (quoting *Markman*, 52 F.3d at 980). The Federal Circuit has observed that dictionaries and treatises can be "useful in claim construction[,]" particularly technical dic-

tionaries which may help the court " 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms." *Id.* at 1318 (quoting *Vitronics,* 90 F.3d at 1584 n. 6). As stated by the Federal Circuit en banc in *Phillips:*

> Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention.

*Id.* (citation omitted).

Extrinsic evidence through expert testimony may be useful to a court for a variety of reasons. *Id.* For example, it may:

> provide background on the technology at issue, [ ] explain how an invention works, [ ] ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or [ ] establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field.

*Id.* "[C]onclusory, unsupported assertions by experts as to the definition of a claim term[, however,] are not useful to a court". *Id.* "Similarly, a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.' " *Id.* (quoting *Key Pharms. v. Hercon Labs. Corp.,* 161 F.3d 709, 716 (Fed.Cir. 1998)).

Although extrinsic evidence can be useful in claim construction, "it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (internal citations

and quotations omitted). "[U]ndue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents." *Id.* at 1319 (citation and internal quotations omitted).

## III. Analysis

The technology at issue pertains to back-mounting magnetic clip-on eyewear. The '747 patent issued with 13 claims describing different embodiments of the invention. Plaintiffs in this lawsuit are asserting only Claim 12 of the patent against Defendant. Claim 12 of the '747 patent, with the six claim elements in dispute highlighted, reads as follows:

> A *primary frame* adapted to support an *auxiliary frame,* which includes a first bridge and two sides, each side having an extension and *each extension including a rear end having a first flange extended downward,* each flange, itself not being a magnet, including a magnetic material, the *primary frame* comprising:
>
> > a second bridge; and
> >
> > two sides, each having a *stud,* each *stud* including a magnetic material;
> >
> > wherein when the primary frame is supporting the auxiliary frame,
> >
> > each magnetic material of the primary frame magnetically engages in a lateral manner with one of the magnetic materials of the auxiliary frame for securing said auxiliary frame to said primary frame;
> >
> > *each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame; and*

*the flanges are located behind the studs to further secure the auxiliary frame to the primary frame,* and to reduce the likelihood of the auxiliary frame from being disengaged from the primary frame if the auxiliary frame is being pulled forward relative to the primary frame.

*See* Report and Recommendation at 6–7 (quoting '747 Patent, col. 5, lines. 38–43; Col. 6, lines. 1–19).

### A. The Magistrate Judge's Report and Recommendation

After carefully considering the parties' claim construction presentations, the legal briefing and applicable law, the magistrate judge recommended the following construction to the court:

- *"primary frame"* should be construed as "the lens rims (if provided), the nose bridge, the rim locks (if provided); and the studs, each of which includes a magnetic material";

- *"auxiliary frame"* should be construed as "the lens rims (if provided); the nose bridge; the extensions; and the first flanges, each of which each includes a magnetic material";

- *"each extension including a rear end having a first flange extended downward"* should be construed as "each extension includes a rear end, a portion of which reaches in a downward direction relative to the remaining portions of the extension and facilitates attachment of the auxiliary frame to the primary frame";

- *"stud"* should be construed as "those portions of each side of the primary frame which include a magnetic material and extend outwardly of the lenses or lens rims (if provided)";

- *"each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary*

*frame from moving downward relative to the primary frame"* should be construed as "at least some portion of each of the extensions reaches above and across the corresponding stud, and is capable, with or without direct contact, of maintaining the corresponding extension in position so as to keep it from falling, sinking or slipping and thus prevent the auxiliary frame f[ro]m moving downward relative to the primary frame"; and

- *"the flanges are located behind the studs to further secure the auxiliary frame to the primary frame"* should be construed as "the flanges are located behind the studs to further secure the auxiliary frame to the primary frame, either through contact or magnetic attraction between the magnetic materials within the flanges and studs."

*Id.* at 20. The magistrate judge also recommended that the court adopt the following construction of claim terms agreed to by the parties in their Joint Claim Construction and Prehearing Statement, namely:

- *"adapted to support"* should be construed as "made for the purpose of supporting";

- *"extension"* should be construed as "a portion of the auxiliary frame that extends away from and rearwardly of the sides of the frame";

- *"support"* should be construed as "holds in position";

- *"supporting"* should be construed as "holding in position"; and

- *"two sides"* should be construed as "left-hand and right-hand portions of the respective frame."

*Id.* at 21.[2]

Plaintiffs filed no objections to the Report and Recommendation. Defendant has objected to the magistrate judge's recommended claim construction of the following disputed claim terms: *"each extension [of the auxiliary frame] including a rear end having a first flange extended downward"*; *"each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame"*; and *"the flanges are located behind the studs to further secure the auxiliary frame to the primary frame."* Defendant has filed no objection to the magistrate judge's recommended claim construction of the disputed claim terms *"primary frame"*; *"auxiliary frame"*; and *"stud."* The court now addresses Defendant's objections.

## B. Defendant's Objections

### 1. "each extension including a rear end having a first flange extended downward"

Defendant objects to the magistrate judge's recommended construction of "each extension including a rear end having a first flange extended downward." To review, the magistrate judge recommended that this disputed element be construed as: "each extension includes a rear end, a portion of which reaches in a downward direction relative to the remaining portions of the extension and facilitates attachment of the auxiliary frame to the primary frame." *See* Report and Recommendation at 20. In recommending this claim construction, the magistrate judge rejected Defendant's argument that "the claim terms are clear enough and need no real construction, especially if it adds extra claim requirements." *Id.* at 11 (quoting Def. Resp. at 6). The magistrate judge essentially adopted the Plaintiffs' proposed construction of the term with the deletion of what she described as "extraneous language." *Id.* at 12.[3]

Defendant argues that the magistrate judge's recommended construction "significantly" broadens the "specific structural shape" of flange 23 illustrated in Figure 3 of the patent, because she recommends the use of the word "portion." *See* Def. Obj.

---

**2.** Plaintiffs had urged the magistrate judge to follow the claim construction in a district court opinion that previously construed the disputed terms in Claim 12 of the '747 Patent at issue in this case. *See* Report and Recommendation at 7 n. 2 (citing *Aspex Eyewear, Inc. v. Miracle Optics, Inc.,* 2003 WL 24188188, 2003 U.S. Dist. LEXIS 26355 (C.D.Cal.2003)). The magistrate judge "decline[d] to rely on those findings for this proposed construction as well as the other relevant constructions" for several reasons. First, she stated that "while similar claim terms were in dispute, the disputes among the parties over construction of those terms varied with respect to some of the terms." Second, she noted that while the *Miracle Optics* opinion provides reasons for rejecting the defendant's proposed construction in that case, it provided no reasons why the plaintiffs' proposed construction was correct. Finally, she stated that there is no requirement that the

court defer to the *Miracle Optiks* opinion. *Id.* (citing *Aspex Eyewear v. Altair Eyewear, Inc.,* 386 F.Supp.2d 526, 535–36 (S.D.N.Y.2005) (declining to defer to claim construction findings, including those in *Miracle Optics,* based in part on its finding that it is the responsibility of the Federal Circuit, rather than individual district courts, to ensure uniformity in claim construction.)).

**3.** Plaintiffs recommended the following definition: "each extension including a rear end having a first flange extended downward" as "each extension includes a rear end having a portion of the extension which protrudes from the rear end thereof and facilitates attachment of the auxiliary frame to the primary frame and where such portion of the extension reaches in a downward direction relative to the remaining portions of the extension." *See* Def. Open. Br. at 10.

at 16. According to Defendant, "redefining 'flange' under the guise of claim construction to mean a 'portion' having any shape 'which reaches in a downward direction relative to the remaining portions of the extension and facilitates attachment' impermissibly broadens Claim 12." Def. Reply to Pl. Resp. at 9–10. Defendant further objects to the magistrate judge's incorporation of functional language, namely, "facilitates attachment of the auxiliary frame to the primary frame," in her construction. Defendant argues that such use of the functional language is inconsistent with the claim language, since Claim 12 requires the flanges to be located behind the studs "to further secure the auxiliary frame to the primary frame," and such a requirement is different from merely "facilitating attachment" of the frames. Def. Obj. at 16. Based on these arguments, Defendant proposes the following definition: "each extension includes a rear end having a flange which extends in a downward direction relative to the remaining portions of the extension to further secure attachment of the auxiliary frame to the primary frame as required by other elements of the claim." *Id.* Defendant further states that its preference is to omit the "further secure" language. *Id.*

In response to Defendant's objections, Plaintiffs contend that the term "portion" used by the magistrate judge in her recommended claim construction "tracks Figure 3" very closely. Pl. Resp. at 7. "As shown in Figure 3, the flange 23 is the portion of the extension 22 located at its rear end; it extends downward relative to the rest of the extension; and it facilitates attachment of the auxiliary frame to the primary frame." *Id.* Plaintiffs also point out that the elements of Claim 12 are not limited to "specific structural shapes" illustrated in the '747 Patent, since "claim elements cannot be restricted to specific embodiments disclosed in the patent speci-

fication, even if only one embodiment is disclosed." *Id.* (citations and internal quotations omitted). Plaintiffs also point to the dictionary meaning of "flange" which they submitted to the magistrate judge at the *Markman* hearing: "[a] protruding rim, edge, rib, or collar, as on a wheel or pipe shaft, used to strengthen an object, hold it in place, or attach it to another object." *Id.* at 8. According to Plaintiffs, "[b]ecause the '747 patent flange is not specifically 'a rim, edge, rib, or collar, as on a wheel or a pipe shaft,' and should not be so limited in the context of claim 12, the more appropriate word to use in the Magistrate's construction was 'portion.' " *Id.*

As to Defendant's objection that the magistrate judge incorporated functional language, namely, "facilitates attachment of the auxiliary frame to the primary frame," Plaintiffs argue that Defendant's "position exalts form over substance," since the words "secure" and "attach" both mean essentially the same thing in this context. Plaintiffs also argue that the magistrate judge's proposed definition of "flange" to include a so-called "functional element" is consistent with its ordinary meaning, a part used "to strengthen an object, hold it in place, or attach it to another object." *Id.*

█ Having considered the magistrate judge's findings and conclusions, the parties' legal briefing and applicable law, the court **overrules** Defendant's objections. The court rejects Defendant's selective argument that "portion" impermissibly broadens the scope of "flange." Defendant is relying on one possible embodiment of the claim. The Federal Circuit has cautioned against this approach to claim construction, "even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification

makes clear that 'the patentee ... intends for the claims and the embodiments in the specification to be strictly coextensive.'" *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed.Cir. 2005) (citing *Phillips*, 415 F.3d at 1323); *SRI Int'l v. Matsushita Electric Corp. of America*, 775 F.2d 1107, 1121 n. 14 (Fed. Cir.1985) (en banc) ("Specifications teach. Claims claim.... That a specification describes only one embodiment does not require that each claim be limited to that one embodiment."). In any event, the term "portion" used by the magistrate judge in her recommended claim construction tracks Figure 3 very closely. As shown in Figure 3, the flange 23 is the portion of the extension 22 located at its rear end; it extends downward relative to the rest of the extension; and it facilitates attachment of the auxiliary frame to the primary frame.

As to Defendant's objection that the magistrate judge's use of the terms "facilitates attachment of the auxiliary frame to the primary frame," the court agrees with Plaintiffs that Defendant's position exalts form over substance. In the context of the patent, the court can conceive no difference between the words "secure" and "attach." Moreover, the functional language is consistent with the claim language itself, which provides that "the flanges are located behind the studs to further secure the auxiliary frame." '747 Patent, Col. 6 lines 15–16. The court agrees with the magistrate judge that in such a situation, the construction recommended by the court properly "gives meaning to all the terms of the claim[.]" Report and Recommendation at 12 (citing *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1384 (Fed.Cir.2005)) (finding that district court's construction of term "clear" as "transparent or having the property of transmitting light without appreciable scattering so that bodies lying beyond are seen clearly" did not impermis-

sibly import a functional limitation, but reflected an appropriate assignment of meaning to the disputed term); *see also Hill–Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 (Fed.Cir.2000) (finding that district court's construction of the term "cushion" as "a structure that provides basic support and comfort" did not impermissibly import extraneous functional limitations into claim, because the construction was consistent with the ordinary meaning of the term and the abstract and description of the patent, noting that the objective of the cushion was to provide support).

2. *"each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame"*

Defendant objects to the magistrate judge's recommended construction of: *"each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame."* The magistrate judge noted that the parties' primary dispute concerned whether the court should adopt a construction requiring the primary frame studs to physically contact the extensions in order to provide support for the auxiliary frame. Essentially adopting the Plaintiffs' proposed claim construction, the magistrate judge recommended that this disputed claim element be construed to mean: "at least some portion of each of the extensions reaches above and across the corresponding stud, and is capable, *with or without direct contact,* of maintaining the corresponding extension in position so as to keep it from falling, sinking or slipping and thus prevent the auxiliary frame f[ro]m moving downward relative to the

primary frame" Report and Recommendation at 20 (emphasis added).

Defendant argues that the magistrate judge's recommended construction is incorrect because: (1) the patent discloses an embodiment in which the extensions directly contact the studs; (2) reading the claim to cover configurations in which the extensions do not directly contact the top surfaces of the studs requires magnetic attraction not disclosed in the patent; and (3) the patent says that engaging contact between the extensions and studs is part of the invention. Def. Obj. at 4–10.

■ The court **overrules** Defendant's objections. While the parties appear to agree that the stud can directly contact the extension to provide the claimed support, the dispute concerns whether the claim requirement can be provided by a magnetic support *without direct contact* between the extension and stud. As argued by Plaintiffs, Patent '747, column 3 lines 4 through 9 of the patent specification discloses that magnetic attraction alone may be used to "solidly secure[ ]" the auxiliary frame to the primary frame. The patent does not state that physical contact between the extension and the upper side of the stud is required for the invention. Moreover, in support of its objection, Defendant points once again to the embodiment of the invention shown in the patent's drawing in the specification, which does show contact. As already stated, the Federal Circuit has cautioned against this approach to claim construction, "even when a specification describes very specific embodiments of the invention or even de-

scribes only a single embodiment, unless the specification makes clear that 'the patentee ... intends for the claims and the embodiments in the specification to be strictly coextensive.'" *JVW Enterprises*, 424 F.3d at 1324 (citing *Phillips*, 415 F.3d at 1323). Moreover, as the magistrate judge correctly noted, "while Defendant points to a drawing that shows contact, Defendant points to nothing else in the specification, or in Claim 12, indicating that contact between the stud and extension is required." Report and Recommendation at 12.

In addition, as Plaintiffs correctly point out, the patent Abstract, a condensed summary of the invention, provides:

> An eyeglass combination includes a primary frame having a bridge and two side studs. An auxiliary frame includes a bridge and two side extensions each having a rear flange for engaging with the stud and for allowing the auxiliary frame to be secured to a typical primary frame. The rear flanges each *includes a magnet for engaging with another magnet engaged in the studs or for engaging with the studs of magnetic material.*

*See* Ex. 1 to Pl. Resp (cited in Pl. Resp. at 11–12) (Plaintiffs' emphasis).[4] Thus, Defendant's contention that the patent discloses only direct contact is incorrect.

### 3. *"the flanges are located behind the studs to further secure the auxiliary frame to the primary frame"*

Defendant objects to the magistrate judge's proposed construction of this ele-

---

**4.** The court rejects Defendant's argument that the magistrate judge relied only on the oral argument of Plaintiffs' counsel at the claim construction hearing to find that physical contact between the extension and the studs was not required. While the magistrate judge did make note in her Report and Recommendation that she found "compelling" Plaintiffs'

arguments to support their assertion that the stud and extension need not have contact (*see* Report and Recommendation at 16), her Report and Recommendation makes clear that she considered the parties' written submission, including the patent, joint claim construction statement and parties' briefs. *See id.* at 1, 17.

ment. As set forth above, the magistrate judge recommended that *"the flanges are located behind the studs to further secure the auxiliary frame to the primary frame"* should be construed as "the flanges are located behind the studs to further secure the auxiliary frame to the primary frame, either through contact or magnetic attraction between the magnetic materials within the flanges and studs." Report and Recommendation at 20. The magistrate judge rejected Defendant's proposed claim construction, namely, that "the flanges are located behind the studs to secure the auxiliary frame to the primary frame in addition to the support provided by the stud and the securing provided by the magnetic force." Under Defendant's proposed construction, the flanges themselves would provide a mechanism for securing the auxiliary frame to the primary frame, which would operate independently of the studs and magnetic materials.

Defendant argues that the magistrate judge's proposed construction is incorrect because: (1) it eliminates the requirement of Claim 12 that flanges "further secure" the auxiliary frame to the primary frame; (2) the patent requires that the flanges contact the studs to "independently" secure the frames together; and (3) the flanges operate independently of the magnetic materials. *See* Def. Obj. at 11–14.

■ The court **overrules** Defendant's objection. According to Defendant, because Claim 12 already requires that the magnetic materials of the flanges and studs engage to secure the auxiliary frame to the primary frame, "it makes no sense to 'further secure' the frames by 'magnetic attraction between the magnetic materials within the flanges and studs.'" Def. Obj. at 12. The court rejects Defendant's contention that the magistrate judge's recommended construction has the flanges "performing the same function twice." *See id.*

The patent discloses that by locating the downwardly extending flanges behind the studs, the flanges provide a "hook means" to further secure the auxiliary frame to the primary frame. '747 Patent, col. 2 lines 61–65. As Plaintiffs correctly argue, "the element the magistrate construed requires the flanges be **'located behind the studs** to further secure the auxiliary frame to the primary frame.'" Pl. Resp. at 12 (original emphasis). The requirement that the magnetic materials of the flanges and studs secure the frames together does not speak to the location of the flanges with respect to the studs; the magistrate judge's recommended construction concerns the claim element that does speak to **where** the flanges are located relative to the studs to facilitate the back-mounting connection. *Id.* Accordingly, the court rejects Defendant's argument that the magistrate judge's recommended claim construction somehow results in the flanges performing the same function twice.

The court further rejects Defendant's argument as another attempt to read out of the patent the inclusion of magnetic material. The magistrate judge's construction properly reflected her rejection of "Defendant's contention that the mechanism by which the flanges secure the auxiliary frame to the stud of the primary frame is necessarily by contact between the flanges and studs." Report and Recommendation at 19. In support, the magistrate judge noted that Claim 12 indicates that the flanges and studs include magnetic materials, and that it is these magnetic materials, rather than the flanges and studs themselves, that engage to secure the frames. Also, as set forth previously (*see supra*), the magnets in the flanges and studs may engage through magnetic attraction without actual contact. Once again, Defendant does not point to any

language in the claim or specification requiring contact.

## IV. Conclusion

For the foregoing reasons, the court **overrules** Defendant's objections to the magistrate judges Report and Recommendation. The court determines that the magistrate judge's findings and conclusions are **correct.** Accordingly, the court **accepts** them as its own. The court, therefore, construes the claim terms "adapted to support"; "extension"; "support"; "supporting"; and "two sides" in the manner agreed upon by the parties in the November 23, 2005 Joint Claim Construction and Prehearing Statement at 2–3, as follows.

- *"adapted to support"* is construed as "made for the purpose of supporting";
- *"extension"* is construed as "a portion of the auxiliary frame that extends away from and rearwardly of the sides of the frame";
- *"support"* is construed as "holds in position";
- *"supporting"* is construed as "holding in position"; and
- *"two sides"* is construed as "left-hand and right-hand portions of the respective frame."

The court construes the disputed claim terms of the '747 patent as follows:

- *"primary frame"* is construed as "the lens rims (if provided), the nose bridge, the rim locks (if provided); and the studs, each of which includes a magnetic material";
- *"auxiliary frame"* is construed as "the lens rims (if provided); the nose bridge; the extensions; and the first flanges, each of which each includes a magnetic material";
- *"each extension including a rear end having a first flange extended downward"* is construed as "each extension includes a rear end, a portion of which reaches in a downward direction relative to the remaining portions of the extension and facilitates attachment of the auxiliary frame to the primary frame";
- *"stud"* is construed as "those portions of each side of the primary frame which include a magnetic material and extend outwardly of the lenses or lens rims (if provided)";
- *"each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame"* is construed as "at least some portion of each of the extensions reaches above and across the corresponding stud, and is capable, with or without direct contact, of maintaining the corresponding extension in position so as to keep it from falling, sinking or slipping and thus prevent the auxiliary frame f[ro]m moving downward relative to the primary frame"; and
- *"the flanges are located behind the studs to further secure the auxiliary frame to the primary frame"* is construed as "the flanges are located behind the studs to further secure the auxiliary frame to the primary frame, either through contact or magnetic attraction between the magnetic materials within the flanges and studs."

**It is so ordered.**

## *FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF THE UNITED STATES MAGISTRATE JUDGE*

IRMA CARRILLO RAMIREZ, United States Magistrate Judge.

Pursuant to the District Court's *Order of Reference and Order Amending Sched-*

*uling Order,* filed June 30, 2006, this case has been referred to the undersigned U.S. Magistrate Judge for a claim construction hearing. Before the Court are:

(1) The parties' *Joint Claim Construction and Prehearing Statement* ("Jt. Claim Constr. State."), filed November 23, 2005;

(2) *Plaintiff's Opening Claim Construction Brief* ("Open.Br."), filed January 3, 2006;

(3) *Opposition Claim Construction Brief for Defendant E'Lite Optik, Inc.* ("Resp."), filed April 24, 2006; and

(4) *Plaintiff's Reply Claim Construction Brief* ("Reply"), filed May 9, 2006.

The Court conducted a claim construction hearing on July 21, 2006. Based on the filings above, the parties' claim construction presentations, and the law applicable to the issues raised, the Court recommends construction of the disputed claims as set forth below.

## I. BACKGROUND

On August 29, 2000, the United States Patent and Trademark Office ("PTO") issued United States Patent No. 6,109,747 ("the '747 Patent"). (Compl. at 2.) The '747 Patent names David Chao as the inventor and Plaintiff Contour Optik, Inc. ("Contour") as the assignee of an invention relating to an eyeglass frame with an auxiliary frame and lenses. *Id.;* Open. Br. Exh. 1 at 4. Contour granted an exclusive license to the invention to Plaintiff Chic Optic, Inc. ("Chic Optic"), which in turn

granted a sublicense to Aspex Eyewear ("Aspex"). (2nd Am. Compl. at 2.) Contour, Chic Optic, and Aspex[1] filed this patent infringement action on September 13, 2000, alleging that Defendant E'Lite Optik, Inc. ("Defendant"), has infringed on the '747 Patent. *Id.* at 3. E'Lite filed a counterclaim seeking a declaration that it is not infringing the '747 Patent and that the '747 Patent is invalid and unenforceable, as well as other relief. (Ans. to 2nd Am. Compl. at 4–5)

The parties filed a joint claim construction statement on November 23, 2005, seeking construction of six terms. (Docket Entry No. 112.) Contour and Chic Optic (collectively, "Plaintiffs") filed their opening claim construction brief on January 3, 2006. (Docket Entry No. 113.) On February 13, 2006, Defendant's counsel moved to withdraw and for an extension of time to respond to Plaintiffs' opening claim construction brief. (Docket Entry No. 116.) The District Court granted the motion to withdraw, and extended Defendant's deadline to respond. (Docket Entry No. 118.) Defendant subsequently retained new counsel, which filed a response brief on April 24, 2006;[2] Plaintiffs filed their reply on May 9, 2006. (Docket Entries Nos. 121 & 126.) On June 30, 2006, the District Court referred the claim construction matter to this Court, which conducted a hearing on July 21, 2006.

## II. CLAIM CONSTRUCTION PRINCIPLES

"[T]he interpretation and construction of patent claims, which define the scope of

---

**1.** Aspex Eyewear was dismissed as a plaintiff for lack of standing pursuant to the District Court's order on E'Lite's motion to dismiss, issued August 26, 2003. (*See* Docket Entry No. 106.)

**2.** Defendant's response to Plaintiffs' opening claim construction brief suggests generally that little or no construction of four of those

terms is necessary, and at the claim construction hearing Defendant's counsel affirmed that its position is that only two terms require construction. However, the Court nonetheless addresses the arguments in Defendant's response, and notes the proposed constructions from the Joint Claim Construction Statement with respect to all disputed terms.

the patentee's rights under the patent, is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970–71 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). To ascertain the meaning of claims, the court considers three sources: "the claims, the specification, and the prosecution history." *Markman,* 52 F.3d at 979 (citations omitted).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed.Cir.2004)). Thus, the Court must first "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996) (citing *Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp.,* 55 F.3d 615, 620 (Fed.Cir.1995)). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips,* 415 F.3d at 1312–1313 (quoting *Vitronics,* 90 F.3d at 1582; citing *Toro Co. v. White Consol. Indus., Inc.,* 199 F.3d 1295, 1299 (Fed.Cir.1999); *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1249 (Fed.Cir.1998)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313 (citing *Innova,* 381 F.3d at 1116; *Home Diagnostics, Inc. v. LifeScan, Inc.,* 381 F.3d 1352, 1358 (Fed.Cir.2004); *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,* 350 F.3d 1327, 1338 (Fed.Cir. 2003); *PC Connector Solutions LLC v. SmartDisk Corp.,* 406 F.3d 1359, 1363 (Fed.Cir.2005); *Schering Corp. v. Amgen Inc.,* 222 F.3d 1347, 1353 (Fed.Cir.2000)).

"Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips,* 415 F.3d at 1314 (citing *Vitronics,* 90 F.3d at 1582). "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips,* 415 F.3d at 1314 (citing *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed.Cir.2001); *CVI/Beta Ventures, Inc. v. Tura LP,* 112 F.3d 1146, 1159 (Fed.Cir.1997)). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips,* 415 F.3d at 1314 (citing *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1538 (Fed.Cir.1991)). In particular, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips,* 415 F.3d at 1314–15 (citing *Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 910 (Fed.Cir.2004)).

Next, because the claims do not stand alone but are part of a fully integrated written instrument comprised primarily of the specification, the Court must review that specification in construing claim terms. *Phillips,* 415 F.3d at 1315 (citing *Markman,* 52 F.3d at 978–79). By statute, the specification must describe the claimed invention in "full, clear, concise, and exact terms" so as to enable those of ordinary skill to make and use that invention. 35 U.S.C. § 112, ¶ 2; *Phillips,* 415 F.3d at 1316. Thus, "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips,* 415 F.3d at 1315 (quoting *Vitronics,* 90 F.3d at 1582).

However, limitations should not be imported from the specification. *Phillips*, 415 F.3d at 1324–25.

Third, when the patent's prosecution history is in evidence, the Court should consider that history in construing claim language. *Markman*, 52 F.3d at 980 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). The prosecution history, which the Federal Circuit has designated as intrinsic evidence, consists of the complete record of the proceedings before the PTO, as well as the prior art cited during the examination of the patent. *Phillips*, 415 F.3d at 1317 (citing *Autogiro*, 384 F.2d at 399.) "The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower then it would otherwise be." *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* (citing *Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed.Cir.2002); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1580 (Fed.Cir.1996)).

In addition to intrinsic evidence, the Court may under certain circumstances turn to extrinsic evidence in construing claim terms. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. "While extrinsic evidence can shed useful light on the relevant art … it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotations omitted) (citing *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed.Cir.2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir.2004)); *Astrazeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1337 (Fed.Cir. 2004)). Extrinsic evidence is less significant than intrinsic evidence because it is less reliable, for a number of reasons. *Phillips*, 415 F.3d at 1318. For example, "extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." *Id.* Despite this and other drawbacks of relying on extrinsic evidence, it "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean[.]" *Id.* at 1319. Thus, the Federal Circuit in *Phillips* directs courts exercising their discretion to admit and use extrinsic evidence to "keep in mind the flaws inherent in each type of evidence [bearing on claim construction] and assess that evidence accordingly." *Id.*

The *Phillips* decision does not preclude district courts from using dictionaries appropriately as a means to better understand the underlying technology or assist in understanding the commonly understood meaning of terms. *Id.* at 1322. However, *Phillips* cautions that courts must be careful to consider dictionary definitions within the context of the patent itself. *Id.* at 1319–22.

With these principles of claim construction in mind, the Court now turns to the disputed claim terms.

## II.  ANALYSIS

Claim 12 of the '747 patent, with the terms at issue underlined, reads as follows:

A *primary frame* adapted to support an *auxiliary frame,* which includes a first bridge and two sides, each side having an extension and *each extension including a rear end having a first flange extended downward,* each flange, itself not being a magnet, including a magnetic material, the *primary frame* comprising:

a second bridge; and

two sides, each having a *stud,* each *stud* including a magnetic material; wherein when the primary frame is supporting the auxiliary frame,

each magnetic material of the primary frame magnetically engages in a lateral manner with one of the magnetic materials of the auxiliary frame for securing said auxiliary frame to said primary frame;

*each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame;* and

*the flanges are located behind the studs to further secure the auxiliary frame to the primary frame,* and to reduce the likelihood of the auxiliary frame from being disengaged from the primary frame if the auxiliary frame is being pulled forward relative to the primary frame.

('747 Patent, Open. Br. Ex. 1 at Col. 5, lns. 38–43; Col. 6, lns. 1–19.) The parties' arguments with respect to each of the disputed terms are addressed below.

## A. Primary Frame

Plaintiffs propose a construction of the term "primary frame" as "the entirety of the primary eyeglass frame with the exception of the lenses, the plastic nose pieces (which touch the upper sides of the wearer's nose), and the leg means (known in the art as 'temple pieces') which extend back over the wearer's ears. [T]he primary frame includes the lens rims (if provided), the nose bridge, the rim locks (if provided), and the studs, each of which includes a magnetic material." (Open. Br. at 8–9.) Plaintiffs assert that "it is beyond dispute that most commercial eyewear frames include lens rims and rim locks to secure the rims around the lenses[ ]" and that including those terms provides a clear, precise construction of primary frame. (Reply at 2.) Plaintiffs further argue that the use of the term "primary frame" in the preamble serves as an antecedent basis for the term's uses throughout the body of Claim 12, and that construction of the term is therefore appropriate.[3] *Id.*

---

**3.** Plaintiffs also cite as support for this proposed construction an opinion, *Aspex Eyewear, Inc. v. Miracle Optics, Inc.,* 2003 U.S. Dist. LEXIS 26355 (C.D.C.A.2003), that previously construed the disputed terms in Claim 12 of the '747 Patent at issue here. The Court declines to rely on those findings for this proposed construction as well as the other relevant constructions for several reasons. First, while similar claim terms were in dispute in that case, the disputes among the parties over the construction of those terms varied with respect to some of those terms. Further, although the *Miracle Optics* opinion provides reasons for rejecting the defendant's proposed instructions, it provides no explanation for why plaintiffs' proposed construc-

tions, which the district court for the most part adopted, are correct. Only in its order on plaintiffs' motion for reconsideration of that opinion did that district court provide a detailed explanation for the revised construction of the term "each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame." (*See* Open. Br. Exh. 3.) Finally, there is no requirement that the Court defer to the *Miracle Optics* opinion. *See Aspex Eyewear, Inc. v. Altair Eyewear, Inc.,* 386 F.Supp.2d 526, 535–36 (S.D.N.Y.2005) (declining to defer to claim construction findings, including those of the *Miracle Optics* court, based in

Defendant argues that "because the body of Claim 12 defines a 'primary frame' having specific features, the claim language itself defines what is or is not part of the primary frame, and it is improper to construe this preamble use of 'primary frame' in detail[.]" (Resp. at 2.) Defendant also argues that the term need not be construed, but in the event that the Court determines that construction is needed, proposes that "primary frame" be construed as "the primary eyeglass frame" or "an eyeglass frame[.]" (Resp at 3; Jt. Claim Constr. State. Exh. B at 1.) In addition, Defendant argues that because the terms "lens rims" and "rim locks" are not used in the patent, they should not be incorporated into the construction of the term. *Id.*

▮ Prior to deciding on an appropriate construction of a term in the preamble, the Court must first decide whether construction of that term is warranted. "In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg.*, 289 F.3d at 808 (citing *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1305 (Fed.Cir.1999)). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Catalina Mktg.*, 289 F.3d at 808 (citing *Rowe v. Dror*, 112 F.3d 473, 478 (Fed.Cir.1997)). While "[n]o litmus test defines when a preamble limits claim scope[,][s]ome guideposts ... have emerged from various cases discussing the preamble's effect on claim scope." *Catalina Mktg.*, 289 F.3d at 808

(citing *Corning Glass*, 868 F.2d at 1257). For example, "dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." *Catalina Mktg.*, 289 F.3d at 808 (citing *Bell Commcn's Research, Inc. v. Vitalink Commcn's Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995)).

As Plaintiffs argue, the scope of Claim 12 depends for antecedent basis on the term "primary frame." The preamble makes clear that Claim 12 addresses a primary frame designed to be able to have an auxiliary frame secured thereto. The Court therefore rejects Defendant's argument that construction of the term primary frame is improper. Moreover, Defendant's reliance on the following passage of *Bristol–Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1373–74 (Fed. Cir.2001) (citations omitted), is misplaced:

> If the body of the claim sets out the complete invention, and the preamble is not necessary to give life, meaning and vitality to the claim, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.

(Resp. at 2–3.) The passage cited indicates that a court should not construe a term in the preamble unless it is "necessary to give life, meaning and vitality to the claim[ ]". The passage does not support the proposition that in such an event, the term should be construed only on a limited basis. This is the proposition Defendant appears to suggest both by its argument and by its proposal of a construction of the term primary frame as "the primary eyeglass frame" or "an eye-

part on its finding that it is the responsibility of the Federal Circuit rather than individual district courts to ensure uniformity in claim construction) (citing *Cybor Corp. v. FAS*

*Techs.*, 138 F.3d 1448, 1455 (Fed.Cir.1998)). Accordingly, the Court respectfully declines to do so.

glass frame[.]" *Id.* at 3; Jt. Claim Constr. State. Exh. B at 1.

In sum, the Court finds that construction of the term "primary frame" is proper, and that the term should be construed as "the lens rims (if provided), the nose bridge, the rim locks (if provided); and the studs, each of which includes a magnetic material." Construing this term in this manner provides clarity with respect to the elements of a disputed term. The claim language itself makes clear that the nose bridge and studs are components of the primary frame. (Open. Br. Exh. 1 at Col. 6, lns. 1–2.) In addition, the Court finds compelling Plaintiffs' argument that the lens rims and rim locks, if provided, are understood by persons of ordinary skill in the art to be included as part of the primary frame, and nothing in the intrinsic evidence suggests that such elements should be excluded.

## B. Auxiliary Frame

Plaintiffs propose a construction of the term "auxiliary frame" as "the entirety of the auxiliary frame with the exception of the lenses. The [auxiliary] frame includes the lens rims (if provided); the nose bridge; the extensions; and the first flanges, each of which each includes a magnetic material." (Open. Br. at 9.) In support, Plaintiffs cite the specification and the drawings therein. *Id.* at 9–10.

Defendant argues that Plaintiffs unnecessarily attempt to add features to the auxiliary frame, and proposes that the Court either avoid construction altogether, or that the Court construe the term as "the auxiliary eyeglass frame" or as "the auxiliary frame includes the first bridge, two sides each having an extension [sic]."[4] (Resp. Br. at 3–4.)

The Court finds that "auxiliary frame" should be construed as "the lens rims (if provided); the nose bridge; the extensions; and the first flanges, each of which each includes a magnetic material." As the Court found with respect to the term "primary frame," a simple, straightforward construction of the term "auxiliary frame" clarifies the meaning of a disputed term. The claim language itself makes clear that the auxiliary frame includes a bridge and two sides, and that each side includes an extension with a flange, and further, that the flange contains a magnetic material.[5] (Open. Br. Exh. 1, Col 5, lns. 38–42.) Including the lens rims appropriately aligns the construction of "auxiliary frames" with the construction of "primary frame."

## C. Each Extension Including a Rear End Having a First Flange Extended Downward

Plaintiffs propose a construction of the term "each extension including a rear end having a first flange extended downward" as "each extension includes a rear end having a portion of the extension which protrudes from the rear end thereof and facilitates attachment of the auxiliary frame to the primary frame and where such portion of the extension reaches in a

4. In the Joint Construction Statement, Defendant proposed that "auxiliary frame" be construed as "a frame which can be attached to the primary frame." (Jt. Claim Constr. State. Exh. B at 1.)

5. Defendant argues that Plaintiffs "construe[] 'auxiliary frame' to require that all of its various parts (bridge, extensions, flanges) must all be made of magnetic material, even though

Claim 12 simply says the auxiliary frame 'includes' magnetic material at several spots (e.g., flanges) rather than requiring that all of it be of a magnetic material." (Resp. at 4.) However, as Plaintiffs point out, their proposed construction describes only the flanges as including magnetic material, and not the rims, bridge, or extensions. (Reply at 2.)

downward direction relative to the remaining portions of the extension." (Open. Br. at 10.)

Defendant argues that "the claim terms are clear enough and need no real construction, especially if it adds extra claim requirements." [6] (Resp. at 6.) In particular, Defendant argues that Plaintiffs' proposed construction unnecessarily alters a term that is understandable in the context of the claim language, and inappropriately seeks to add a functional limitation to the term flange. (Resp. at 7–8.)

The Court finds that the term "each extension including a rear end having a first flange extended downward" should be construed as "each extension includes a rear end, a portion of which reaches in a downward direction relative to the remaining portions of the extension and facilitates attachment of the auxiliary frame to the primary frame." This construction essentially adopts the Plaintiffs' proposal in two respects. First, this construction explains the term flange. Rather than using Plaintiffs' proposed explanatory language, however, the Court's construction eliminates extraneous language which appears to confuse rather than clarify what is essentially an uncomplicated term that contains a somewhat uncommon word.

Second, the Court's construction also incorporates the part of Plaintiffs' proposed construction providing that the flange portion of the extension facilitates attachment of the primary and auxiliary frames. Notwithstanding the Defendant's argument otherwise, the proposed functional limitation here is consistent with the claim language itself, which provides that "the flanges are located behind the studs to further secure the auxiliary frame." (Open. Br. Exh. 1, Col 6, lns. 15–16.) In

such a situation, the construction recommended by the Court properly "gives meaning to all the terms of the claim[.]" *See Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1384 (Fed.Cir.2005) (finding that district court's construction of term "clear" as "transparent or having the property of transmitting light without appreciable scattering so that bodies lying beyond are seen clearly" did not impermissibly import a functional limitation, but reflected an appropriate assignment of meaning to the disputed term) (citing *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed.Cir.2005)); *Hill–Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 (Fed.Cir.2000) (finding that district court's construction of the term "cushion" as "a structure that provides basic support and comfort" did not impermissibly import extraneous functional limitations into claim, because the construction was consistent with the ordinary meaning of the term and the abstract and description of the patent, noting that the objective of the cushion was to provide support) (citations omitted). Thus, the phrase "facilitates attachment of the auxiliary frame to the primary frame" is appropriately incorporated into the construction of the term "each extension including a rear end having a first flange extended downward."

### D. Stud

Plaintiffs propose a construction of the term "stud" as "those portions of each side of the primary frame which include a magnetic material and extend outwardly and rearwardly of the lenses or lens rims (if provided). The studs pivotally connect to the leg or 'temple' pieces." (Open. Br. at 11.)

---

**6.** In the Joint Claim Construction Statement, Defendant proposed the following construction: "each extension including a flange extending downward from the end of the extension furthest from the frame." (Jt. Claim Constr. State. Exh. B at 1.)

Defendant argues that no construction is needed, but asserts that in the event that the Court decides to construe the term "stud," it should be construed "to mean a projection. The projection may extend outwardly from the side of the primary frame."[7] (Resp. at 8.) Defendant argues that the term stud should not be construed as extending rearward because the drafter in other instances in the patent described a part as extending rearward, and that because he did not so describe the stud in that manner, the Court should not read such an addition into the claim. (Resp. at 9.) Also, Defendant argues that the Court should not read the term "lens rim" into the patent, because the patent mentions no such feature.[8] (Resp. at 9.)

■ The Court finds that the term "stud" should be construed as "those portions of each side of the primary frame which include a magnetic material and extend outwardly of the lenses or lens rims (if provided)." Such a construction is consistent with the language of Claim 12 itself, which addresses a primary frame designed to support an auxiliary frame with extensions that reach over the side of the primary frame parallel to the lenses or, if present, lens rims. Also, the claim language, which provides that each side of the primary frame has a stud, with "each stud including a magnetic material" indicates clearly that the studs include magnetic material. (Open. Br. Exh. 1 at Col. 6, lns. 2–3.)

The Court rejects two features of Plaintiffs' proposed construction. One is Plaintiffs' proposal to construe the studs as extending rearward. Plaintiffs point out that the drawings in the specifications show studs that extend rearward.[9] (Reply at 6.) However, Plaintiffs cite no written portion of the specification, or any other intrinsic evidence, indicating that the studs extend rearward. The context of the claim language itself provides no support for construing the stud as extending rearward, as the claim language addresses support of the auxiliary frame with extensions reaching over only the side of the primary frame. The Court's construction does not exclude the possibility that the studs extend rearwardly. Rather, the Court's construction simply reflects a finding that nothing other than the illustration in the specification would so indicate, and that the illustration is insufficient here to merit inclusion of the rearward extension phrase. See Advanced Cardiovascular Sys., Inc. v. Scimed, 261 F.3d 1329, 1339 (Fed.Cir.2001) (finding that because nothing in the specification assigned significance to an element

7. In the Joint Claim Construction Statement, Defendant proposed a construction of the term "stud" as "an outwardly extending projection." (Jt. Claim Constr. State. Exh. B at 1.)

8. Defendant also argues that Plaintiffs inappropriately "define the stud as only the portions including magnetic material[,] because Claim 12 does not require that the whole stud be made of magnetic material". (Resp. at 9.) This argument reflects an apparent misreading of Plaintiffs' proposed construction, which in the Court's view does not require that the entire stud be made of magnetic material, but simply that it include a magnetic material.

9. Plaintiffs assert without elaboration that construing "stud" to include a rearwardly extending portion is not only consistent with the patent drawings, but also with "the technological functionality of the claimed invention." (Reply at 6.) The nature of Plaintiffs' argument is not clear. To the extent that Plaintiffs are arguing that a failure to construe the studs as extending rearward would render the claim invalid as nonfunctional, the Court notes that the Federal Circuit "has not endorsed a regime in which validity analysis is a regular component of claim construction." Phillips, 415 F.3d at 1327. In the instant case, where Plaintiffs make a passing and unclear reference to functionality, the Court declines to consider such an argument.

of the drawings, the proposed limitation related to that limitation would not be imported into the claim construction) (citing *Kraft Foods, Inc. v. Int'l Trading Co.,* 203 F.3d 1362, 1367–69 (Fed.Cir.2000); *Toro Co. v. White Consol. Indus, Inc.,* 199 F.3d 1295, 1300–02 (Fed.Cir.1999); *Wang Labs., Inc. v. Am. Online, Inc.,* 197 F.3d 1377, 1382–83 (Fed.Cir.1999)).

The Court also rejects Plaintiffs' proposal to add to the construction of "stud" the sentence "[t]he studs pivotally connect to the leg or 'temple' pieces." Plaintiffs argue that "it cannot be disputed that most commercial eyewear include[s] temple pieces pivotally connected to the frame that fit[s] over the wearer's ears to secure the eyewear to the wearer's head." (Reply at 7.) Plaintiffs further argue that such temple pieces are described in prior art referenced in the '747 Patent's specification, and that "[p]rior art references discussed in a patent may be considered in claim construction since they may be indicative of what those skilled in the art believe a certain term means." (Reply at 7.) The case they cite for this proposition, *In re Cortright,* 165 F.3d 1353 (Fed.Cir.1999) addresses a patent seeker's appeal of the Patent and Trade Office's denial of a patent, and not the issue of claim construction as in the instant context. However, the cited portion of *In re Cortright* does refer to *Vitronics Corp. v. Conceptronic, Inc.,* which addresses the use of prior art in claim construction by the district court, and provides that:

> [A] court in its discretion may admit and rely on prior art proffered by one of the parties, whether or not cited in the specification or the file history. This prior art can often help to demonstrate how a disputed term is used by those skilled in the art ... Once again, however, reliance on such evidence is unnecessary, and indeed improper, when the disputed terms can be understood from

a careful reading of the public record. *See Kearns v. Chrysler Corp.,* 32 F.3d 1541, 1547 (Fed.Cir.1994). Nor may it be used to vary claim terms from how they are defined, even implicitly, in the specification or file history.

90 F.3d at 1584–85. Here, Plaintiffs have not proffered evidence of the '207 Patent; thus, the Court need not consider whether to admit and rely upon that prior art. Moreover, the intrinsic evidence here supports a construction of stud that does not include temple pieces, and there is nothing in the intrinsic evidence to indicate that including the temple pieces in the construction of stud is appropriate. While Plaintiffs assert that commercial eyewear includes temple pieces pivotally connected to the frame, the Court finds no reason to include the sentence "[t]he studs pivotally connect to the leg or 'temple' pieces[ ]" in the construction of the term "stud."

### E. Contact Between Primary and Auxiliary Frames

Plaintiffs and Defendant dispute whether contact is required between the studs of the primary frame and the extensions and flanges of the auxiliary frame.

#### 1. Each Stud is Extended Over by One of the Extensions, and Can Support That Extension to Prevent the Auxiliary Frame from Moving Downward Relative to the Primary Frame

Plaintiffs propose a construction of the term "each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame" as "at least some portion of each of the extensions reaches above and across the corresponding stud, and is capable, with or without direct contact, of maintaining the corresponding extension in position

so as to keep it from falling, sinking or slipping and thus prevent the auxiliary frame f[ro]m moving downward relative to the primary frame." (Open. Br. at 12.) Defendant argues that the only way that the stud can support the extension is through contact.[10] (Tr. at 24, lns. 2–3.) Thus, with respect to this term, the parties primarily dispute whether the Court must adopt a construction requiring that the primary frame studs contact the extensions in order to provide support for the auxiliary frame. (Resp. at 11.)

The Court finds that at the claim construction hearing, Plaintiffs presented compelling arguments to support their assertion that the stud and extension need not have contact. Counsel pointed out that "[i]f you put two magnets close enough there's an attraction and they engage. And anybody skilled in the art would—would tell you that. It's not just physical touching, it's magnetic attraction." (Tr. at 45, lns. 20–23.) Counsel further explained that "if the magnetic materials don't touch each other but have sufficient magnetic attraction to hold, you need the support, you need 22 to sit on 12 [referencing labeled parts of invention's drawings in the specification]. But if the magnets touch each other and there's support, that way you don't need 22 to sit on 12." (Tr. at 46, lns 2–6.) Based on this explanation, the Court finds that nothing in the specification or claim language supports a finding that contact between the stud and the extension is required for engagement between those two pieces to occur.

Defendant argues that "[t]he specification shows that the studs contact and support the extensions to prevent downward movement, and thus the claims require

this contact and support[.]" (Resp. at 11.) To support this assertion, Defendant cites the following statement from *Phillips:* "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." (Resp. at 11, citing *Phillips,* 415 F.3d at 1316.) Defendant's reliance on this passage is misplaced, as Defendant points to nothing in the claim language requiring contact, and the passage does not dictate that the Court adopt a construction that precisely reflects the embodiment of the invention shown in the patent's drawing in the specification. In fact, case law clearly establishes that the Court need not do so. *See Teleflex Inc. v. Ficosa N. America Corp.,* 299 F.3d 1313, 1325–28 (Fed.Cir.2002) (holding that "embodiments disclosed in the specification [are] not determinative of the meaning of disputed claim terms.") (citations omitted). Here, while Defendant points to a drawing that shows contact, Defendant points to nothing else in the specification, or in Claim 12, indicating that contact between the stud and extension is required.

Accordingly, the Court finds that the term "each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame" should not be construed to include a touching requirement. The Court further finds that Plaintiffs' proposed construction includes explanatory language consistent with the claim language. Thus, the Court finds that the term should be construed as proposed by Plaintiffs: "at least some portion of each of the extensions reaches above and across the corre-

---

10. In the Joint Claim Construction Statement, Defendant proposed the following construction: "each extension extends over a stud that supports the extension and prevents the auxil- iary frame from moving downward relative to the primary frame." (Jt. Claim Constr. State. Exh. B at 1.)

sponding stud, and is capable, with or without direct contact, of maintaining the corresponding extension in position so as to keep it from falling, sinking or slipping and thus prevent the auxiliary frame f[ro]m moving downward relative to the primary frame."

### 2. The Flanges are Located Behind the Studs to Further Secure the Auxiliary Frame to the Primary Frame

Plaintiffs propose a construction of the term "the flanges are located behind the studs to further secure the auxiliary frame to the primary frame" as "the flanges are located behind the studs to further fasten the auxiliary frame to the primary frame." (Open. Br. at 12.) Defendant does not propose a specific construction, but states that it:

> favors the plain reading of the claim language which requires the flanges to actually "further secure" the frames together, and [Defendant] would make this clear by construing the term with explanatory language on the additional securing achieved by the magnets and studs.

(Resp. at 20.)[11] This additional securing, Defendant argues, must take place through contact between the flanges and the studs that is independent of attraction between the magnetic materials included therein. (Resp. at 21.) As framed by Defendant, the central dispute with respect to this term is "whether the flanges secure the frames together by engaging or contacting the studs, or whether the flanges merely include magnetic material so a previously claimed magnetic coupling can secure the parts together." *Id.* at 19.

The Court finds that the term "the flanges are located behind the studs to further secure the auxiliary frame to the primary frame" should be construed as "the flanges are located behind the studs to further secure the auxiliary frame to the primary frame, either through contact or magnetic attraction between the magnetic materials within the flanges and studs." In the context of this claim term, the substitution of the term "fasten" for "secure," as suggested by Plaintiffs, does not provide any additional clarity to the term; rather the additional explanatory language added by the Court resolves the dispute over the term's meaning. This construction also reflects the Court's rejection of Defendant's contention that the mechanism by which the flanges secure the auxiliary frame to the studs of the primary frame is necessarily by contact between the flanges and studs. Plaintiffs point out that Claim 12 indicates that the flanges and studs include magnetic materials, and that it is these magnetic materials—rather than the flanges and studs themselves—that engage to secure the frames. (Tr. at 30, lns. 4–6.) Furthermore, as discussed above, the magnets in the flanges and studs may engage through magnetic attraction without actual contact. In addition, Defendant does not point to any language in the claim or specification requiring contact. Accordingly, the Court finds that the term "the flanges are located behind the studs to further secure the auxiliary frame to the primary frame" does not need to be construed to require contact between the flanges and the studs.

### V. CONCLUSION

For the foregoing reasons, the Court recommends that the following disputed

11. In the Joint Claim Construction Statement, Defendant proposed the following construction: "the flanges are located behind the studs to secure the auxiliary frame to the primary frame in addition to the support provided by the stud and the securing provided by the magnetic force." (Jt. Claim Constr. State. Exh. B at 1.)

terms of the '747 patent be construed as follows:

(1) The term "primary frame" should be construed as "the lens rims (if provided), the nose bridge, the rim locks (if provided); and the studs, each of which includes a magnetic material."

(2) The term "auxiliary frame" should be construed as "the lens rims (if provided); the nose bridge; the extensions; and the first flanges, each of which each includes a magnetic material."

(3) The term "each extension including a rear end having a first flange extended downward" should be construed as "each extension includes a rear end, a portion of which reaches in a downward direction relative to the remaining portions of the extension and facilitates attachment of the auxiliary frame to the primary frame."

(4) The term "stud" should be construed as "those portions of each side of the primary frame which include a magnetic material and extend outwardly of the lenses or lens rims (if provided)."

(5) The term "each stud is extended over by one of the extensions, and can support that extension to prevent the auxiliary frame from moving downward relative to the primary frame" should be construed as "at least some portion of each of the extensions reaches above and across the corresponding stud, and is capable, with or without direct contact, of maintaining the corresponding extension in position so as to keep it from falling, sinking or slipping and thus prevent the auxiliary frame f[ro]m moving downward relative to the primary frame."

(6) The term "the flanges are located behind the studs to further secure the auxiliary frame to the primary frame" should be construed as "the flanges are located behind the studs to further secure the auxiliary frame to the primary frame, either through contact or magnetic attraction between the magnetic materials within the flanges and studs."

In addition, the Court recommends that the following terms be construed as requested by the parties and as set forth below:

(1) The term "adapted to support" should be construed as "made for the purpose of supporting."

(2) The term "extension" should be construed as "a portion of the auxiliary frame that extends away from and rearwardly of the sides of the frame."

(3) The term "support" should be construed as "holds in position."

(4) The term "supporting" should be construed as "holding in position."

(5) The term "two sides" should be construed as "left-hand and right-hand portions of the respective frame."

**SO RECOMMENDED.**